## Case No. 12,955.

### The SLOGA.

[10 Ben. 315.] [1]

District Court, S. D. New York. Feb., 1879.

SHIPPING—DAMAGE TO CARGO—BURDEN OF PROOF—STOWAGE AND DUNNAGE.

1. A brig having taken on board at Pernambuco a quantity of mats of sugar to be brought to New York, under a charter and bills of lading which excepted perils of the seas, the sugar on her arrival at New York was found to have been washed entirely out of some mats and partly out of others. The consignees filed a libel against the brig to recover the loss as being occasioned by bad stowage and lack of sufficient dunnage. The sugar was green sugar and liable on that account to excessive drainage, but it appeared that twelve per cent was the limit of drainage usual in such sugars on such a voyage, which was much less than this had lost. It appeared that the brig met with severe weather on the voyage, but the log showed that she was kept pumped during the voyage and that the pumps were able to keep her free all the time, and she made no more water after the heaviest gale than at first. Held, that the burden was on the brig to show that the loss was occasioned by a peril of the sea, the consequences of which could not have been guarded against by the master and crew with the means available to them.

[Cited in The Chasca, 23 Fed. 160; The Queen, 28 Fed. 757; F. O. Matthiessen & Wiechers Sugar Refining Co. v. Gusi, 29 Fed. 795.]

[See Bearse v. Ropes, Case No. 1,192.]

2. The comparatively good condition of the top of the cargo showed that the loss was not occasioned by the vessel's having taken in water through the seams of the deck.

3. As appeared from her log, the crew had been at all times able to control the leak, and

---

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

the water did not appear at any time to have been as deep in her as the platform on which the sugar was stowed, and the injury to the sugar was caused by the water reaching it in the bilges when the vessel rolled.

4. On the evidence, the vessel did not have sufficient dunnage under the cargo in the bilges to protect the cargo from such injury. Such lack of dunnage was bad stowage and the vessel was liable for the damage to the cargo therefrom.

[Cited in The Charles J. Willard, 38 Fed. 762; The Centurion, 57 Fed. 415.]

In admiralty.

Geo. H. Forster, for libellants.
W. R. Beebe, for claimants.

CHOATE, District Judge. This is a libel by Edward F. Davison and others against the brig Sloga for failure to deliver in good order and condition a cargo of sugar shipped at Pernambuco under charter and bill of lading, which excepted only "all the dangers and accidents of the seas and navigation of whatsoever kind." The vessel left Pernambuco on the 13th of November, 1873, having shipped 5,100 bags of green sugar consigned to the libellants. Her voyage was from Pernambuco to Hampton Roads for orders and thence to her port of discharge. She arrived at Hampton Roads and there received her orders for New York and arrived in this port January 19, 1874. Upon the delivery of her cargo, it was found that 59 bags were entirely empty and 329 bags slack and greatly reduced in the quantity of their contents, and it is to recover damage for this loss that the suit is brought. The libel, after alleging the failure to deliver according to the bill of lading, charges that the loss was caused by the "careless, negligent and improper manner in which the said merchandise was stowed and the absence and want of proper dunnage and the want of proper care on the part of the master, his officers and crew and persons employed by him or them, and by reason of their careless and negligent failure to furnish proper, or any dunnage, in the bilge, and between the sugar and sides of the vessel many bags of sugar were sweated and stained by sea water and the heat of the vessel, by reason of such want of proper dunnage, whereby the sugar ran out of many of the bags entirely, and partly out of other bags, from leakage and from sea water blown through the ceiling in heavy weather." The answer avers that the sugar was shipped in bad condition; that it was new and raw sugar, dripping with molasses when shipped; that the sugar was stowed by a stevedore exclusively employed and controlled by the shipper, and that therefore the ship is not responsible for any fault in the stowage; that the cargo was, in fact, well and properly stowed and strictly in accordance with the custom of the port of Pernambuco; that the loss of weight was caused by the raw and green condition of the sugar and the great quantity of molasses that drained out of it; that the vessel encountered heavy gales, los-

ing spars and sails, having her decks swept many days by the sea; that though the brig was tight, staunch and strong, she was strained by the violence of the wind and sea, and took in water through her seams, and that by the rocking and pitching on the sea the pressure of the cargo was increased and by this pressure the molasses was more and more pressed out, and that this was the cause of some of the bags being found empty and others greatly reduced in weight.

As to the defence that the ship is not responsible because the shippers undertook to stow the cargo themselves, it is enough to say that by the terms of the charter party the ship was clearly bound to receive and stow the cargo, and there is no evidence that by any other or subsequent agreement she was ever released from this obligation. And I do not understand that the testimony of the master is that he did not receive and direct the stowage of the cargo. At any rate, if it will bear that construction, it is not sufficient proof of the fact against the evidence of the charter party and bill of lading and the testimony taken at Pernambuco.

The cargo consisted of green or unclayed sugar, and the proof is clear that such sugars are subject to a considerable loss of weight; but the evidence is positive and sufficient to show that this cargo consisted of bags of sugar in good order and condition, for this class of sugars, when shipped, and while the ship must have the benefit of a full allowance for loss of weight, so far as it can be probably attributed to the dripping of the molasses from such sugar, yet there is nothing in the evidence which warrants the conclusion that from the mere character and nature of the sugars, even when submitted to the heavy pressure caused by the superincumbent weight of cargo or the rocking and tossing of the ship at sea in heavy weather, the bags would be entirely emptied of their contents or shrunk, as the bags were in this case. So far as evidence has been given on that point, twelve per cent loss of weight is about the limit to be ascribed to this cause. The fact that the bill of lading contained the words "weight and contents unknown," is of no importance in this case, first, because these words, being part of the printed blank used for making out the bill of lading, are controlled by the written parts of the bill which give the number of bags of sugar received and their weight, and, secondly, because the proof is sufficient as to the actual weight and condition of the sugar delivered to the ship.

There is some confusion and contradiction in the testimony as to where in the ship these empty and slack bags were found, but the weight of the evidence is that they were found in the bottom of the cargo, some on the platform on which the cargo was laid and along the keelson, but the greater part of them in the bilges of the vessel. It is proved by the testimony of both sides that the upper part of the cargo was found to be in good or-

der, somewhat stained by the sweat of the hold or by sea water blown in about the hatches, but not appreciably injured or showing any marks of having been so wet from above as to be reduced in weight from that cause. I take this to be conclusive evidence that while there is no possible explanation of the condition of the empty and slack bags except that the sugar was washed out by sea water, the water which did the damage did not come from above through the deck or hatches and find its way thus through the mass of the sugar to the bottom. It also appears that the inner ceiling of the ship was well caulked and that after the discharge hardened sugar was observed upon the sides of the ceiling where the bags had rested. It would be contrary to the evidence, therefore, to conclude that the sea water which did the damage was blown through this inner ceiling, as seems to be suggested in the libel, or that it found its way down along this ceiling from above to the lower part of the hold. At the bottom of the hold, and raised fourteen inches above the bottom the ship at the keelson, was a permanent platform of planks, running athwart-ships at a very slight incline upwards and joining the side at the bilge keelson where the caulked inner ceiling stopped. This platform was of planks laid close together but not caulked, nor was it water-tight, and the effect of all the evidence is that the sea water which did the damage reached the cargo through this platform from the bottom of the ship.

The rule of law to be applied to this case is too well settled to require any extended comment. The ship is bound by its contract to deliver the cargo in good order and condition, unless prevented from doing so by the excepted peril. If the cargo is delivered in a damaged condition, the burden is on the ship to show that the case comes within the exception contained in the bill of lading. If, then, the ship shows that it has encountered a sea peril to which the injury can be properly attributed, and that peril is shown to have been adequate to produce the injury, and it does not appear that there were at the command of the master sufficient means to overcome the peril or prevent the damage likely to result therefrom to the cargo, then the ship will be held to have made out a prima facie defence and it will be incumbent on the libellants to produce further evidence of negligence. Clark v. Barnwell, 12 How. [53 U. S.] 270; The Niagara v. Cordes, 21 How. [62 U. S.] 7; Transportation Co. v. Downer, 11 Wall. [78 U. S.] 129; The Shand [Case No. 12,702]. But the ship does not excuse damage to the cargo as caused by a peril of the sea if the damage could have been prevented, notwithstanding the peril encountered, by the utmost exertions of the master and crew and the full use of all the resources at the command of the ship. Same cases.

Now, in this case, the defence attempted is that the damage, so far as it is not attributable to the intrinsic character of the sugar itself, was caused by perils of the sea—that the cargo, being properly stowed and dunnaged, was injured by sea water taken in during violent storms and heavy weather at sea, and which washed the cargo and melted and washed the sugar, in spite of the necessary diligence and care of the master and crew. This defence is to be determined by the decision of two questions: First, did the ship, through stress of weather and the violence of the winds and seas, take in so much sea water as can account for the damage done to the cargo, and which damage the utmost exertions of the ship's company were unable to prevent and resist? And, secondly, was the injury caused in whole or in part by bad stowage of the cargo and insufficient dunnage? As to the first of these questions, the evidence is chiefly to be drawn from the testimony of the master, officers and crew, and from the log of the vessel. By the log and all the testimony, it appears that the brig was a remarkably tight ship. The fact has already been referred to, that though she encountered very rough weather, and her decks were swept by the seas, she took no water in, in that way, of any consequence. The log and testimony show that, while she was lying at Pernambuco receiving her cargo, she made almost no water, her pumps bringing up molasses which drained out of the sugar. On the day she left port the entry in the log is "pump gave five inches molasses every twelve hours," and on the second day out with smooth sea, "three inches water mixed with molasses every eight hours," and the same entry occurs on the 26th of November and afterwards at intervals till the 5th of December, and again on the 19th and 21st of December. It was not till the 23d of December that the vessel met any rough weather. On that day the weather became bad towards night, and by the log at midnight the wind blew a gale from the S. E. and the sea began to wash the deck. The log contains the entry: "Pumping is done every two hours, making three to four inches water." On the 24th, the sea was very rough, "causing her to roll fearfully," "three to four inches water pumped." At noon of the 25th, "a fearful gale breaks out, with such a heavy sea that the deck is filled with water, washing several things, the kitchen, the fowl basket, etc. The pump is at work every hour and fear is entertained that the cargo has been damaged by the rolling of the vessel." On the 26th, "a furious gale and deck continually under water. About 2 p. m. the wind nearly oversets the vessel, rendering her steerless," "pumping done every hour to avoid damage to cargo." For the next four days the log shows strong winds and heavy seas, the pumps being worked with "usual rate of water," and that without further noticeable weather or any observable leak she arrived at Hampton Roads on the 2d of January. She left Hampton Roads January 11th. On the 12th, by the log, with

pretty rough sea, "pumping was done every six hours, making always water mixed with molasses." On the 13th, "pumping was done every four hours." On the 15th, "every two hours." The next two days were clear and pleasant. On the 17th "pumping done every twelve hours, making water mixed with molasses." On the 18th they took the pilot and a tug to bring them to an anchorage in this port. The testimony of the master and crew certainly adds little or nothing to the strength of the evidence to be gathered from the log as to the perils of the sea encountered upon this voyage. The captain testified that they had good weather during the earlier part of the voyage; that they pumped every twelve hours, pumping out molasses, but very little water; that they had very hard weather by Cape Hatteras, commencing about the 23d of December, the first gale lasting about twenty-four hours, so that they had to lay to, losing some sails, the kitchen, etc., and some of the bulwarks; that on the 26th and 27th they had a still heavier gale, and he says that in the heavy weather they pumped every hour and found she was leaking three inches an hour, but he says they kept her free, that they pumped up molasses with water. After that, till they arrived at Hampton Roads, the weather was more moderate, and they pumped every two, every four, and every six hours. As to the weather after leaving the Roads, he says that for the first few days it was very rough weather, a gale continuing two days with a rough cross sea. It is to be observed that the pumping up of molasses mixed with water was an incident of the entire voyage and not noticeably increased after the greatest gale they encountered, on the 26th and 27th of December. One of the crew testifies that during the fine weather after leaving Pernambuco they pumped every six or every twelve hours, according to the weather, that it took ten to twenty minutes to free her, and that during the rough weather when they pumped once an hour, it took ten to fifteen minutes to free her. The mate testified that during the gale of the 26th of December, she was on her beam ends ten or fifteen minutes, and that the carrying away of her sails righted her. Giving all proper credit to this evidence, it is apparent that the vessel, although she met several days of very rough weather, and at least one gale of exceptional violence, yet at no time had any leak which was not entirely under the control of the crew, nor was the weather such at any time as prevented the regular working of the pumps and keeping the vessel free of water. If the pumps were diligently attended and she was kept free, as the officers and crew swear, it is difficult to account for so large damage by sea water as is proved in this case, provided the cargo was properly stowed and dunnaged. While a vessel is not to be expected to stow and dunnage her cargo to keep it out of the reach of the water if she springs a leak which cannot be controlled by the pumps, it is not too much to require her upon an Atlantic voyage in winter to stow and dunnage it so that if her pumps work well and she does not spring a leak which they cannot control, the cargo shall be safe from damage by sea water from the mere rolling and pitching of the vessel in the sea in heavy weather, and an occasional severe gale. And upon the whole testimony I do not think I should be warranted in holding that the ship has shown that she encountered such perils of the sea, adequate to account for the damage, and uncontrollable by the resources at the command of the ship, as will account for the damage and throw upon the libellants the burden of making out a further case of negligence. In this posture of the case it is not for the libellants to prove affirmatively how it was that the water rose in the ship so as to submerge the cargo. Negligence of the ship is presumed from the fact that the damage was done and that the means of preventing it were at hand. The ship has on this point failed to make out her defence.

On the other question, whether the ship was imperfectly dunnaged in the bilges, the evidence is very conflicting. The claimants take the ground, first, that the ship was of such a build that she needed no dunnage in the bilge except the very slight layer of bamboo mats and palm leaves which are admitted to have been there; that she was so sharp that in fact she had no bilge, and, secondly, if she had a bilge and needed dunnage, she was well dunnaged with wood, boards and planks below the palm leaves and mats. The grounds thus taken are somewhat difficult to reconcile. And it is not obvious why the master should have taken the trouble to dunnage with wood and plank, if no dunnage was necessary. As to this claim, it is enough to say that the weight of evidence is very strongly against the claimants; that the evidence does not warrant the conclusion that any thing was used to keep the bags of sugar from the skin of the ship at the bilges except mats and palm leaves and a few bamboo sticks, so laid and at such intervals as not to prevent the bags of sugar from being closely pressed down against the skin of the vessel. On the other question, whether the build of the vessel was such as to require dunnage at the bilges, there is a great deal of testimony of experts, conflicting, of course, and much of it very unsatisfactory. The result of the testimony is I think, that she was a sharp vessel, but not so sharp as to carry her cargo safely without several inches of additional dunnage in the bilges, such as the claimants attempted but failed to prove was there. The most satisfactory evidence on this point is the behavior of the vessel herself and the condition of her cargo when she arrived. It cannot but be admitted that in arranging the dunnage it should be so proportioned as to protect, with an approach to an equality, the different parts of the cargo. The object of dunnage in the bilges is to protect the cargo in that part when the ship rolls

over or is on her beam-ends, whereby this shall be brought to be the lowest part of the ship to which all the water in her will run. Now, in this case the great disproportion of the damage at the bilges seems to me to indicate that she was not proportionately well dunnaged there and this strongly confirms what I think is the weight of the evidence that she required more dunnage there. Of course the wetting of the bags of sugar in the bilges and the collecting of the water there and the drainage from these wet bags would have a strong tendency when the vessel was thrown over the other way to carry the water back along the planks of the platform towards the keelson, and in this way the washing out of the sugar in the bags along the keelson can be accounted for, even if the water was not allowed to rise so high under the platform as to have otherwise washed this part of the cargo. The water in the bilges would not all immediately find its way through the cracks of the platform, especially as the bags of sugar were not raised from the platform at all, except by the thickness of the mats and leaves.

On the ground, therefore, that the ship has failed to show that the damage to the cargo was caused by a peril of the sea, and that it is proved that it was caused in whole or in large part by insufficient stowage and dunnage, there must be a decree for the libellants, with costs, and a reference to compute the amount of the damages.