## THE QUEEN.

*(District Court, S. D. New York. July 29, 1886.)*

1. CARRIERS—OF GOODS BY VESSEL—DISCHARGE OF CARGO—DELAY—PERMANENT REPAIRS UNNECESSARY FOR VOYAGE—GENERAL AVERAGE.

Repairs made necessary by a general average cause are a subject of general average affecting the cargo, so far as the repairs are reasonably necessary to enable the ship to prosecute the voyage; but a ship is not justified in discharging a large amount of cargo, or in incurring long delay, for the purpose of making permanent repairs, when comparatively slight and temporary repairs, reasonably sufficient to complete the voyage, could be made speedily, and with small change in the cargo.

2. SAME—TRANSHIPMENT OF SUGAR—LOSS IN WEIGHT—SECONDARY DRAINAGE.

The bark Queen, from Bahia to New York, loaded with a cargo of sugar, having met with heavy weather, which broke one of the carlines of the main hatch, and caused a crack in the main beam, put into St. George for necessary repairs. For the purpose of putting in a *new* main beam, when the court found the crack in the old beam could have been sufficiently repaired for the voyage at slight expense and with little delay, she unshipped a large part

of the cargo, and incurred a delay of six weeks longer than would have been needed for temporary repairs, during which time the sugar, through the transhipment and change of temperature, as the court found upon the facts, incurred a large and unusual loss of weight by "secondary drainage." *Held*, that the ship was liable for the unusual loss in weight thus caused.

In Admiralty.

*Sidney Chubb*, for libelant.

*North, Ward & Wagstaff*, for claimants.

BROWN, J. The libel claims $6,000 damages for loss in weight of a cargo of sugar shipped at Bahia, to be delivered at New York. The bills of lading, dated November, 1883, recited the receipt, in good order and condition, of 10,261 bags, 718,810 kilos net, which are equal to 1,586,334 pounds, or 708 tons. Upon the discharge at New York, March 25 to 28, 1884, but 1,410,150 pounds gross were delivered; which, deducting the tare, 28,198, leaves 1,381,952 pounds,—a difference of 294,382 pounds, or about 92 tons.

On January 10th, when off Hatteras, the bark met very heavy weather, and shipped a great deal of water, which broke a carline or sleeper on the starboard side of the main hatch, so that the deck at that point sagged down from two to three inches, and also, as alleged, cracked the main beam of the hatch at a point about two feet from the hatch. The master deemed it necessary to put into St. George, Bermuda, for repairs, which he reached on January 13th. An official survey was held, resulting in the recommendation that a new main beam and sleeper be put in; two yards and a topmast renewed; the deck and top sides caulked, besides some other repairs; and that so much of the cargo be unloaded as was necessary to bring the metal line a foot above water, for the purpose of caulking the top sides. About two-thirds of the cargo, 7,632 bags, were accordingly landed; the repairs recommended were made; the cargo reloaded; and the bark was ready to sail by February 26th. Still further detained, as alleged, through the delay of the material-men in rendering their bills, the bark finally sailed on March 11th, and arrived in New York, without further accident, on March 20th. The entire expense at Bermuda was about £1,200; of which about £702 was apportioned to general average, and the residue, including all the repairs, was imposed on the bark alone. Of the general average charges, about £400 were for the unloading, storage, and reloading of the cargo. The agents of the underwriters on the cargo, though strenuously objecting to the extent of the repairs made and of the unloading of the cargo, in the end advanced to the captain, without prejudice, some £500 on account of the charges incurred for the cargo.

On discharging the bags at St. Georges, about 500 were found badly damaged by sea-water, which had made its way through the broken deck, and upon the starboard side. The rest of the bags were then deemed in good condition. On reloading, a considerable number of

those that appeared sound on the discharge were "stained and mussy," and indicated some drainage. On discharging at New York 3,300 bags were sound, weighing 468,132 pounds gross, or an average of about 142 pounds per bag; 5,500 bags damaged, weighing 753,998 pounds gross; 1,315 bags "badly damaged," weighing gross 175,874 pounds; 155 bags "slack," weighing 12,048 pounds; and twelve bags empty, weighing 78 pounds; total, 10,282 bags, gross 1,410,150 pounds. The extra number of bags arose from the purchase of some new bags at Bermuda on account of some old ones that had become broken.

The libelant alleges that putting in a new beam at Bermuda was unnecessary, and that this involved a great loss of time, and waste of the sugar unladen, through secondary drainage, caused by the heat and moisture to which it thereby became exposed; that the amount of sugar unladed there was also greater than was necessary for the repairs made; and that there was unreasonable delay both in the time taken for repairing and in sailing after the bark was ready for sea. I find it necessary to consider only the first three of these charges.

There was an unusual loss in the weight of the sugar on this voyage, for which the ship must answer, unless she satisfactorily accounts for the loss without fault on her part. The bills of lading specify, in the written parts, the net weight of sugar received on board "in good condition." The net weight delivered was 204,382 pounds less. A printed clause in the bills of lading says, "Weights and contents unknown." This permits the ship to show, if she can, a less weight received, or that all received was delivered. But the burden of doing so remains on her. *The Sloga*, 10 Ben. 315.

The whole number of bags was delivered; but not all the weight. There is no direct evidence impeaching the correctness of the weight put aboard; and the master's testimony concerning the draught of the bark at different times, and her dead-weight capacity, are not so consistent as to furnish any reliable *data* for rejecting the weight receipted for in the bills of lading. The same draught is given for 442 tons and for 480 tons. The difference in weight must therefore be accounted for by natural loss, by sea damage, or by the fault of the ship.

1. *Natural loss.* The testimony of Mr. Putnam shows that a loss of 6 per cent. from natural waste is the highest shown during a large experience in such shipments. The 3,300 sound bags, constituting nearly one-third of the cargo, may be fairly considered as representing an average of the different sizes of bags. The weight of these, when shipped at Bahia, upon the average of the whole number, would be 510,175 pounds net. On delivery at New York, they weighed, deducting 6,600 pounds tare, 461,532 pounds, or an average of nearly 140 pounds per bag,—a loss of 48,643 pounds, or $9\frac{1}{3}$ per cent. of their net weight when shipped. Considering that the voyage was prolonged two months by putting in to Bermuda, thus doubling the

time of the ordinary passage from Bahia, and the consequent period for the natural waste, this percentage of $9\frac{1}{3}$ per cent. loss on the sound bags is no more than, from the testimony of Mr. Putnam, would be expected as the ordinary loss during so long a period. At the rate of $9\frac{1}{3}$ per cent. decrease, the whole cargo would show a natural loss of 148,057 pounds.

2. The damage from *sea-water* through the storm of January 10th, according to the evidence, affected 498 bags only; since, on arrival at Bermuda, and the unshipment of three-quarters of the cargo there, only that number was found wet or damaged. These were stored by themselves, and on reloading were stowed forwards. The 2,629 bags that were not unshipped at Bermuda were sound, and 3,300 were delivered sound in New York. The highest weight of any 500 among the sound bags delivered was 73,160 pounds, and at New York there were but 12 bags wholly empty, and but 155 called "slack." The weight of the 155 slack bags was 12,048 pounds, instead of 21,700 pounds, which would be the average weight of the same number of sound bags,—a loss of 9,652 pounds. The remaining 343 bags of the 498 found damaged at Bermuda would show, according to the least weights stated in the weigher's returns of the 1,315 "badly damaged," a net loss not exceeding 8,000 pounds. Allowing these last two items as the final result of the original damage by sea-water to the 498 bags, they make, with the natural loss above estimated, 165,709 pounds; leaving 38,673 pounds still to be accounted for. This loss, distributed among the remaining 6,464 bags found damaged on delivery at New York, would amount to but about six pounds per bag, or about $4\frac{1}{4}$ per cent. on the net weight. This is not, indeed, a large discrepancy; but, after the liberal allowance of $9\frac{1}{3}$ per cent. made upon the whole cargo, it is too great to be disregarded. It makes in all a loss in net weight of $13\frac{1}{2}$ per cent. on that part of the cargo, which, according to the general testimony of the claimants' own witnesses at Bahia, and according to the separation of the cargo made there by them, was not damaged on arrival there; and that is a rate of loss which ought not to be set down to natural damage, or the mere inexplicable contingencies of the voyage. If, as suggested by claimants' counsel, the weight of the 3,300 sound bags was below the average weight of the whole number when loaded at Bahia, the result would be more unfavorable to the ship; because the natural loss being then less than the $9\frac{1}{3}$ per cent. above allowed on the whole cargo, the loss chargeable to other causes than natural waste would be greater.

The claimants' witnesses give no satisfactory explanation of the excessive loss in weight last referred to. The master, indeed, testifies that, on the whole discharge at Bahia, he thought about 10 per cent. of the bags were marked with moisture. But this is not entitled to outweigh the specific account kept each day of the sound bags and of the damaged bags, as they were removed, separated, and numbered

at the time. There are no causes assigned for any injury to sound bags after the reshipment at Bermuda, during the subsequent voyage of nine days to New York. The only remaining explanation, therefore, is that claimed by the libelant, viz., the secondary drainage that arose in the bags discharged sound at Bahia, caused by the unshipping of the cargo there. This is not only testified to by Mr. Putnam as a not uncommon result of such handling and stowing in a warm and moist climate, but as noticed by him in these bags at Bermuda at the time when they were reshipped. If the unshipment, therefore, was not necessitated by the sea damage, nor requisite to the proper repair of the ship at Bermuda, then the loss arising from secondary drainage must be charged to the vessel. This leads us to the remaining question discussed at the hearing, concerning the injury to the main hatch beam, and the necessity of the long delay, and of the unloading of the cargo at St. George.

3. There is great contradiction in the evidence on some of the most material facts bearing on these points. Without discussing this evidence in detail, the conclusions to which I have come are as follows:

(a) The master was justified in putting in to Bermuda for repairs, and in holding the official survey. The weight of testimony is that the main beam was cracked. The tests applied, of heavy weights, and jumping above it, are, with the other testimony, I think, conclusive. Some of the correspondence put in evidence tends also to discredit the libelant's case in this respect.

(b) I have no doubt, upon the evidence, that the main beam might have been strenghtened, without removal, by splicing and bolting, so as to be entirely sufficient, and render the vessel seaworthy for the residue of the voyage. I do not find in the evidence any satisfactory answer to the testimony of Mr. Boardman on this point, who was a disinterested and competent witness. The official survey held at Bermuda doubtless gives the master a certain *prima facie* support; since it recommended all the repairs made. But the conceded rivalries at St. George, and the manifest interest to induce as large repairs there as possible, greatly weaken the weight to be attached to the survey. The testimony of the official surveyor, moreover, has not been taken in this cause to show that temporary repair by splicing and bolting would not have been sufficient for a trip of nine days to New York; nor has any other proof been given from masters and shipwrights, easily obtainable to testify on such a point, to weaken the force of Mr. Boardman's testimony. The testimony of the master and carpenter of the ship, and of those who did the repairs at St. George, states, in a general way, that all the repairs made were necessary. That repairs of the cracked beam and broken sleeper were necessary is, doubtless, true; but no one testifies that temporary repair of the beam, by splicing and bolting, would not have been sufficient, and the general testimony given is not equivalent to that. The crack was slight; its existence even is disputed by two witnesses who ex-

amined the beam to see if any such crack existed. Otherwise the beam was sound. Boardman says it looked shelled, and he could not tell whether the crack went through the beam or not. That the master was perfectly familiar with the method of strengthening such a beam by splicing and bolting cannot be doubted.

Some discretion ought doubtless to be left to the master concerning the extent of the repairs to be made in a port of distress. He is bound to put the ship in good seaworthy condition if possible, (*Hazard* v. *New England Marine Ins. Co.*, 1 Sum. 218; *Starbuck* v. *Same*, 19 Pick. 198;) and his general authority does not restrict him necessarily to repairs, that will be exhausted by the voyage, (*Green* v. *Briggs*, 6 Hare, 395; *Brooks* v. *Oriental Ins. Co.*, 7 Pick. 268.) But he is bound to act in good faith for the interests of both ship and cargo; and when temporary repairs, quite sufficient for the rest of the voyage, can be made quickly and with slight expense, he is not justified in inflicting a heavy charge upon the cargo, and in otherwise endangering its condition, through long delay, for the sake of making permanent repairs for the general advantage of the ship and her owners. *Wilson* v. *Bank of Victoria*, L. R. 2 Q. B. 203, 211, 212. In the case last cited, BLACKBURN, J., says: "Inasmuch as the master could, by the expenditure of a comparatively small sum on temporary repairs and coals, bring the ship and cargo safely home, it was his duty to do so;" and it is intimated that if the master had done more, and unshipped the cargo for that purpose, his owners could not have charged the expense of unloading to the cargo, but would have been liable to the cargo owners.

The substitution of a new beam in place of the old one, in this case, when, as I am entirely satisfied, the repair of the old one would have been quite sufficient for the voyage, was, under the circumstances of this case, in my judgment, an unnecessary and unjustifiable mode of repair. It compelled the discharge of a much greater quantity of sugar than would have been otherwise required; set in motion secondary drainage, which could not have been wholly unexpected; and entailed a long delay at Bermuda, with the consequent increased waste. Seven days were employed in unlading, and five days in reshipping. To repair the beam without removing it would have required scarcely more than the removal of the 498 damaged bags, which could have been done in a day; and no reason appears for a detention of more than two weeks altogether for such temporary repairs as were necessary. From the fact that the cargo was worth much more than the bark, the expenses on a general average would fall mostly on the cargo; and these expenses include some charges which, if the repairs had been made in New York, would have fallen wholly on the ship. It is not necessary to determine what was the master's motive in making more than temporary repairs at Bermuda, —whether because he supposed they could be done cheaper there than in New York, or in order to have but one job, instead of two,

or from some more personal interest, or from mere error of judgment. But the course pursued was, in my opinion, so plainly such a sacrifice of the interests of the cargo as to make the ship answerable for the loss thereby caused.

The other circumstances shown by the evidence are not such as to indicate that any considerable discharge of the cargo was necessary. If the topmast was so decayed as to require renewing, as recommended in the survey, and all the top sides from the metal up needed recaulking, it is difficult to believe that the bark was in suitable condition when she left Bahia, seven weeks before. I do not, however, adopt that alternative, though that would make the ship equally liable. The fact that, during the hour elapsing between the two soundings of the pumps by the surveyors on their first survey, there was no increase of water in the pumps, indicates that there was no actual necessity for all the caulking done on the top sides; and on arrival at Bermuda the caulking of the deck was started in only two seams next the main hatch.

Although, by the American law, necessary repairs in a port of distress, made necessary by a general average cause, are themselves a subject of general average, yet it was stated by the supreme court, in the case of *The Star of Hope*, 9 Wall. 203, 236, that "expenses for repairs beyond what are reasonably necessary to enable the ship to proceed on her voyage are not general average." *McAndrews* v. *Thatcher*, 3 Wall. 347; *The Hornet*, 17 How. 100; *The Ann Elizabeth*, 19 How. 162; *Brooks* v. *Oriental Ins. Co.*, 7 Pick. 268; *Atwood* v. *Sellar*, 4 Q. B. Div. 342; S. C. 5 Q. B. Div. 286; *Svensden* v. *Wallace*, 11 Q. B. Div. 616. But where the repairs are such that, even under our liberal law on that subject, they would not be general average, there can be no justification for inflicting on the cargo a heavy expense for the sake of making permanent repairs, instead of such temporary ones as would perfectly well serve the purposes of the voyage.

The ship must be held chargeable, therefore, for the loss arising from secondary drainage consequent on the unnecessary landing of so many sound bags, and the long delay at Bermuda. This loss apparently amounts, as I have said, to about 38,673 pounds. But, as I must find the long delay at Bermuda unjustifiable, so much of the natural waste as arose through and during the unnecessary delay must also be charged against the ship; and this, from the comparative length of time, cannot be less than $1\frac{1}{2}$ per cent. This operated upon the whole damaged part of the cargo, viz., 1,124,802 pounds net; and would cause a loss, at the rate of $1\frac{1}{2}$ per cent., amounting to 16,872 pounds. To the previous items of loss, 16,872 pounds must therefore be added for this cause, making in all an apparent loss of 55,545 pounds.

If either party, however, desires a reference to take further proof on the subject of damage, which was not fully considered on the

trial, a reference may be taken; otherwise damages will be allowed for the loss of 55,545 pounds of sugar at the market rates on March 20, 1884, with costs.