## THE CHARLES J. WILLARD.

### SERRALES v. THE CHARLES J. WILLARD.

(*District Court, D. New Jersey.* May 9, 1889.)

SHIPPING—PERILS OF THE SEA—BURDEN OF PROOF.

A bill of lading is a policy of insurance, guarantying the safety of the goods against all risks except the perils of the sea; and whenever the shipowner, in claiming exemption from liability for an admitted loss, pleads a peril of the sea, the burden of proof is upon him to make out a *prima facie* case; and where the loss is shown to have been caused by water being driven into the hold, but it does not appear that the pumps and limber-holes were kept in proper order, or were properly inspected by the ship's officers, the defense is not made out.

In Admiralty. Libel for damage to cargo.
*Sidney Chubb*, for libelant.
*Benedict, Taft & Benedict*, for respondents.

WALES, J. The libelant sues to recover damages, estimated at $3,500, for injury to a quantity of concrete sugar shipped by him in good order on board the three-masted schooner, Charles J. Willard, at Nacoris, San

Domingo, and to be delivered in New York in like condition, the dangers of the seas only excepted. The bill of lading was signed on the 6th of August, 1886, and the vessel sailed two days afterwards. The sugar was contained in 500 bags, 90 hogsheads, and 55 barrels, which were all properly stowed and well dunnaged in the lower hold; the hogsheads forming the ground tier, and resting on the dunnage, a few inches above the ceiling. On discharging the cargo at the end of the voyage, the 2d and 3d of September, three feet of water were found in the hold; many of the hogsheads were entirely empty, others of them badly ullaged, and the contents of the remaining packages seriously injured. The captain of the schooner was surprised at this discovery, and was at first unable to account for the excess of water, but, subsequently, on his examination before the commissioner, undertook to explain the mystery in this way: On the eleventh day out from Nacoris, the schooner encountered stormy weather, and had to lay to for 36 hours under reefed foresail and mainsail, during which time she labored heavily, shipping several seas, one of which broke through the cabin and galley windows, and flooded the floors to the depth of six or eight inches. This water "started the sugar some, and, it being so thick, it could not get through the ceiling readily. We pumped out what there was went under the ceiling; the rest remained on the ceiling till it got up into those hogsheads. Certainly it kept melting more and more; and, as it melted, it made it still thicker, and it couldn't get through the ceiling to get at the pumps. That is the best of my judgment." The entry in the ship's log for September 2d reads as follows:

"This day comes in with fine weather, and wind north-north-west. Commenced discharge at 2 P. M., and discovered there was three feet of water in hold. Tried pumps, but they would not take. Can't give any account of it, except the blow-holes got stopped up, or pumps choked."

This entry was made by the mate, who testified before the commissioner that after the failure of the pumps to throw water he went into the hold, and shoved a stick down into one of the blow-holes, and then he caught the water and pumped until he was directed to stop. On the homeward voyage the pumps were worked every two hours during stormy weather, and every four hours in moderate weather; and would suck at four inches. The water thrown up was highly colored. The defense is that the damage was caused by a peril of the sea, combined with the inherent defect of the cargo, which, being a mixture of sugar and molasses, not properly described as either, was easily subject to drainage.

The testimony on behalf of the libelant proves that the schooner was tight and strong, and, on an inspection made after most of the cargo had been taken out, showed no leak, or signs of having been strained. The deck and flooring were tight. The marine inspector, who was employed by the underwriters to examine her, reported in writing that both her pumps were useless, being broken in some part below the deck. In assigning this cause, he may probably have been mistaken, but he found that practically the pumps would not work for some reason, be-

cause, on taking out the limber-board, everything seemed to be right, and he had previously sounded the pumps, and measured 15 inches of water in the well, which rose over the flooring a little. The water seemed to be clear; enough, in his judgment, for the pumps to suck if they had been in proper condition; but neither of them would take water. The captain stated, on being questioned by the inspector, that it was not his custom to sound his pumps at sea; that he worked them regularly until they sucked, which they would do at four inches. This witness is corroborated by the appraiser, Mr. Putnam, who adjusted the loss, and who says the captain seemed to be surprised that so much water was in the hold, and did not know anything about it until he was notified by the stevedore who discharged the cargo. On being asked about his limbers, the captain said that they had not been cleaned out for 18 months, and in the mean time he had carried two cargoes of coal. Mr. Putnam testifies that there were 3 feet of water in the hold, and he could see from the marks on the hogsheads that there had been 30 inches of water over the ceiling. Both of libelant's witnesses were on board of the schooner, and held conversations with the captain while the cargo was being discharged. Each has had a long experience in his business, and neither has any apparent interest in this suit. The captain talked without reserve, and these witnesses have no motive for misrepresenting what he said. He referred in these conversations to the storm of the 19th of August, when the floors of the cabin and galley were flooded, and thought that most of the water had been bailed out. It is evident he did not then think that any considerable quantity had leaked through to the hold, nor does the entry, of September 2d, in the log assign that as a cause of the damage. It is unnecessary to review the testimony further. A careful examination of the whole record has produced the conviction that the damage complained of resulted from the unseaworthiness of the vessel, or from the negligence of the officers who were in charge of her. Either the limber-holes were stopped up by coal, or by sugar drainage, or by both, which prevented the water from running into the wells, or the pumps were in some way out of order, and practically useless; and in either case it was the duty of the officers to have discovered these obstructions and defects, and to have removed or remedied them. On these facts there can be no uncertainty as to the liability of the ship-owners. The burden is on them to prove a sea peril adequate to have caused the damage, and the inability of the officers to have provided against it or its consequences. The water which broke through the small windows,—each 12 inches x 14 inches,—and only a small portion of which could have got below, was not sufficient in quantity to fill the hold of the vessel, 108 feet long, to the depth of 30 inches above the ceiling. Nor will the peculiar character of the cargo afford any excuse for the want of vigilance on the part of the officers to keep the limber-holes free, and the pumps in good working order. The upper works of the schooner were tight, her ceilings were not calked, and, as the drainage of concrete sugar does not exceed 6 per cent., the respondents have not made out such a *prima facie* case of sea peril as to

throw on the libelant the burden of proving the unseaworthiness of the vessel, or the negligence of the carriers.

A bill of lading is but a policy of insurance guarantying the safety of the goods against all risks except the perils of the seas; and whenever the ship-owner, in claiming exemption from liability for an admitted loss, pleads a peril of the sea, he must furnish satisfactory evidence of the fact, to bring the loss within the exception; otherwise the ship will be accountable to the full extent of the damage. The law of the case is too well settled to admit of or require much discussion. A leading case is *Clark* v. *Barnwell*, 12 How. 272, in which it was held that where goods are shipped, and the usual bill of lading given, promising to deliver them in good order, "the dangers of the seas excepted," and they are found to be damaged, the *onus probandi* is upon the owners of the vessel to show that the injury was occasioned by one of the excepted causes. But, although the injury may have been so occasioned, yet still the owners of the vessel are responsible, if the injury might have been avoided by the exercise of reasonable skill and attention on the part of the persons employed in the conveyance of the goods. But the *onus probandi* then becomes shifted upon the shipper to show negligence. In the case at bar, there is no evidence that the cabin and galley windows were protected by shutters at the time the sea broke through, or that the limber-holes had been kept clear enough to permit the free passage of the water to the wells. If the latter precautions had not been taken, the pumps could be of little use, if indeed they were not defective or out of order. Want of attention to these matters was neglect on the part of the vessel's officers to exercise reasonable skill and care in the performance of their duties. *The Sloga*, 10 Ben. 315; *The Shand*, Id. 294; *The Centennial*, 7 Fed. Rep. 601, 2 Fed. Rep. 409; *The Pharos*, 9 Fed. Rep. 912; *The Samuel E. Spring*, 29 Fed. Rep. 397. A decree will be entered for the libelant, and, unless the parties can agree upon the amount of damages, an order of reference will be issued to ascertain them.